UNITED STATES of America,
Plaintiff–Appellee,

v.

Hiram Stanley SASSER, II,
Defendant–Appellant.

Nos. 91–6205, 91–6263, 91–6340 and 91–6359.

United States Court of Appeals,
Tenth Circuit.

Sept. 3, 1992.

---

Gary Peterson, of Oklahoma City, Okl., for defendant-appellant.

Richard A. Friedman (Timothy D. Leonard, U.S. Atty., and Karen A. Morrissette, Deputy Chief, Fraud Section, Criminal Div., Dept. of Justice, were with him on the brief), Atty., Appellate Section, Criminal Div., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before SEYMOUR and TACHA, Circuit Judges, and BENSON, District Judge.*

TACHA, Circuit Judge.

This appeal arises out of appellant Hiram Stanley Sasser's conviction on one count of conspiracy under 18 U.S.C. § 371, one count of mail fraud under 18 U.S.C. § 1341, and seven counts of making false statements to the Department of Housing and Urban Development (HUD) under 18 U.S.C. § 1010. On appeal, Sasser raises the following eight arguments: (1) his prosecution for conspiracy, mail fraud and false statements was barred by the Double Jeopardy Clause of the Fifth Amendment; (2) the government was unlawfully relieved of its burden of proof, on the scienter element of the charged offenses, by a jury instruction that permitted Sasser's knowledge to be proven by a showing of conscious purpose to avoid learning the truth; (3) the district court incorrectly refused jury instructions supporting the defense that the prices specified in written sales contracts were correct as a matter of state law; (4) the government's prosecution was barred by the Paperwork Reduction Act; (5) the scienter requirement for mail fraud was improperly relaxed by the jury instructions; (6) the district court erred in admitting evidence that constituted an adverse comment on Sasser's exercise of his Fifth Amendment privilege against self-incrimination; (7) there was insufficient evidence to support a conspiracy conviction against Sasser when none of the other charged conspirators was found guilty; and (8) the district court lacked jurisdiction to amend its written judgment after a notice of appeal had been filed. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## BACKGROUND

The government introduced the following evidence at trial. Sasser conspired with co-defendants Charles and John Bizzell to secure seven HUD-insured mortgage loans by knowingly and willfully submitting false documents to HUD[1] in connection with those loans. During this conspiracy, Sasser was employed as a loan officer for the Talman Home Mortgage Corporation, an approved lender in the HUD–FHA mortgage insurance program that operated in the Oklahoma City area. The Bizzells were real estate developers in the area of Mid-

---

* The Honorable Dee V. Benson, District Judge for the United States District Court for the District of Utah, sitting by designation.

1. HUD administers the Federal Housing Administration (FHA) single-family home mortgage insurance program. Under that program, which is available only to financially qualified buyers, the FHA may insure loans to real estate investors—as opposed to occupants of the purchased home—in amounts up to eighty-five percent of a home's appraised value. The borrower is required to put up the remaining fifteen percent as a cash investment of his or her own funds.

west City, Oklahoma and were familiar with the HUD–FHA mortgage insurance program.

During late 1985, Sasser arranged to purchase seven single-family homes from the Bizzells. These homes were to be financed through Talman. The sales contracts for each of these homes falsely stated that the sales price was the appraised value of the property. However, Sasser arranged with the Bizzells to pay them only the amount of the FHA-insured financing that Talman could provide for the purchase of each property. The documents associated with the sale falsely indicated that Sasser paid his required fifteen percent investment in the form of cash deposits and cashier's checks brought to the closings of the seven properties; however, Sasser never in fact used any of his own money. Instead, the Bizzells supplied the funds that were used for the cashier's checks, and the cash down payments were fictitious.[2]

When HUD began to investigate these transactions, the Bizzells initially told an investigator that Sasser had paid the cash down payments and supplied the cashier's checks from his own funds. Later, the Bizzells confessed to the investigator that Sasser had not paid the amounts represented in the documents as coming from his own funds.

Following that admission, however, Sasser and the Bizzells apparently concocted a cover story that the amounts shown on the documents as paid by Sasser represented a fifteen to seventeen percent real estate commission earned by Sasser on the sales. These commissions supposedly were credited to Sasser by the Bizzells to eliminate the need for him to pay any of his own money to complete the transactions. The documents associated with the sales and loans did not disclose any such real estate commissions.

In order to obtain FHA insurance for a mortgage loan on each property, Sasser caused Talman to submit an application for commitment for insurance to HUD. Supporting documentation, including verification-of-deposit forms, accompanied the application. These documents represented that Sasser, as the borrower, possessed adequate financial resources to complete the purchase of the property. They also indicated that Sasser would make the required investment of his own funds to complete the purchase. The application for commitment for insurance included a blank requesting that the borrower state the portion of his own assets in "Cash (Including deposit on purchase)" used to purchase the property. In this blank, Sasser stated $61,-406, an amount that included a fictitious $50,000 certificate of deposit allegedly held at the First Republic Trust Company of Dallas, Texas.

Sasser arranged for Mark McFerrin, on behalf of First Republic Trust Company, to verify that certificate of deposit on a verification-of-deposit form, which later was sent through the mails to Talman and then to HUD. The evidence indicated that Sasser never held a $50,000 certificate of deposit at First Republic. Testimony at trial indicated that First Republic was dormant at the time, did not have authority to issue certificates of deposit, and never issued any certificates of deposit. In addition, Sasser's tax accountant testified that Sasser never reported interest from any such certificate of deposit on his 1985 or 1986 tax returns. The evidence also revealed that, several months prior to the date Sasser claimed to own the $50,000 certificate of deposit, he filled out an application to refinance his personal home. Sasser did not disclose existence of the certificate of deposit or of any comparably sized asset on the application. Finally, upon the liquidation of First Republic Trust Company, Sasser never filed any claim with the Texas state liquidator to recover $50,000, even

---

2. The Bizzells assisted Sasser by obtaining cashier's checks from their own funds and presenting them at the closing as Sasser's down payments and closing costs. Sasser and the Bizzells told investigators that cashier's checks containing both Sasser's and the Bizzells' names and used at the closing represented payment of realtor's fees owed to Sasser for the sale of the properties.

though he maintained that the funds held in the certificate of deposit had been embezzled by that company.

The application for commitment for insurance on each property also included a blank requesting the borrower to fill in the "amount" required to "purchase existing home." In this blank, Sasser falsely stated an amount equal to the appraised value of the property. In another blank requesting the amount of "cash from borrower" and "other credits," Sasser falsely stated amounts that he did not pay himself. However, these amounts created the impression that the amount borrowed, and insured by HUD, would not exceed eighty-five percent of the properties' appraised value. Sasser signed the borrower's certification on the back of the application for commitment for insurance. This certification included the statement, "The Borrower certifies that ... the information in Section II is true and correct to the best of his/her knowledge and belief."

Sasser made timely payments on all seven properties. After applying for five new HUD-insured loans, Sasser traded the five properties he bought from John Bizzell to Charles Kent Bizzell for five different properties. Charles Bizzell also credited Sasser with an $8,000 trade-in allowance for each of the five properties. Charles Bizzell then resold the properties to five individuals who assumed the HUD-insured loans by simple assumption. Each property subsequently went into foreclosure.

On February 22, 1990, Sasser was indicted for conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (Count 1), mail fraud in violation of 18 U.S.C. § 1341 (Count 2), making false statements to HUD for purposes of obtaining federally insured loans in violation of 18 U.S.C. § 1010 (Counts 3–16), and making false statements to a federal agency in violation of 18 U.S.C. § 1001 (Count 21). After a jury trial, Sasser was convicted on the conspiracy count, the mail fraud count, and seven of the counts charging false statements to HUD (Counts 3–9). After the jury did not reach a verdict on the

remaining counts, the government dismissed those counts with prejudice.

In a written judgment, the district court sentenced Sasser to concurrent two-year prison terms on counts 3–9, to run consecutively with a one-year sentence that Sasser had received for an earlier conviction. On counts 1 and 2, the district court sentenced Sasser to four-year prison terms without any provision for a consecutive sentence, although such a provision had been made orally during the sentencing hearing. On October 11, 1991, Sasser filed his notice of appeal from the October 1 judgment. Five days later, on October 16, the district court entered an amended written judgment on its own initiative. The amended judgment stated that the four-year sentences on Counts 1 and 2 would be served consecutively to any other sentence. Sasser filed a notice of appeal from the amended judgment on October 28, 1991.

## DISCUSSION

### I.

Sasser argues that he was unlawfully subjected to double jeopardy by his trial and sentencing on all counts. Prior to the trial in this case, Sasser was convicted on a separate indictment of conspiracy and underlying substantive charges that involved criminal conduct in which Sasser, in his position as a loan officer, fraudulently facilitated acquisition of HUD–FHA financing on eighty-three properties. *United States v. Gary,* No. CR–90–101–W (W.D.Okla.1991), *aff'd in part, rev'd in part,* 971 F.2d 470 (10th Cir.1992). Before the trial began in this case, Sasser filed a motion to dismiss the conspiracy and mail fraud charges on double jeopardy grounds. The district court denied the motion, and Sasser appealed that ruling (Appeal No. 91–6205) and sought a stay of the trial pending the resolution of the appeal. The district court denied the stay. Sasser subsequently moved to dismiss the other counts in the indictment on double jeopardy grounds. The district court also denied this motion. Sasser appeals this ruling in Appeal No. 91–6263.

Sasser argues that his prior conviction for conspiracy in the *Gary* case bars the conspiracy prosecution in this case. Sasser asserts that because all of the loans involved in both alleged conspiracies furthered the shared objectives of the loan participants, and because one group of loans benefitted the other, a single conspiracy encompassed both groups of loans.[3]

■ Sasser argues that the district court erred in using the *Blockburger* "same evidence" test to decide double jeopardy in the context of successive conspiracy prosecutions. *See Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).[4] We review de novo the district court's legal conclusion regarding double jeopardy claims. *United States v. Raymer,* 941 F.2d 1031, 1037 (10th Cir. 1991); *United States v. Cardall,* 885 F.2d 656, 665 (10th Cir.1989). We will not overturn the district court's factual conclusions unless they are clearly erroneous. *United States v. Rogers,* 960 F.2d 1501, 1506 (10th Cir.1992); *Raymer,* 941 F.2d at 1037; *United States v. Jones,* 816 F.2d 1483, 1486 (10th Cir.1987).

In *Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), the Supreme Court stated that to determine whether the Double Jeopardy Clause bars successive prosecutions, "a court must first apply the traditional *Blockburger* test. If application of that test reveals that the offenses have identical statutory elements or that one offense is a lesser included offense of the other, then the inquiry must cease, and the subsequent prosecution is barred." *Id.* at 516, 110 S.Ct. at 2090. If the prosecution is not barred by the *Blockburger* test, then the Double Jeopardy Clause may still bar the prosecution if the government, "to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted." *Id.* at 521, 110 S.Ct. at 2093.

■ In this case, we find no error in the district court's order denying Sasser's motion. Before engaging in its double jeopardy analysis, the district court reviewed the Supreme Court's decision in *Grady.* The district court concluded that the analysis in *Grady* and *Blockburger* did not bar the prosecution in this case because Sasser's second prosecution involved different events and entirely different facts. We agree.

---

3. As part of his double jeopardy argument, Sasser contends that the district court erred in assigning him the burden of establishing his double jeopardy claim. Although Sasser recognizes that in this circuit the burden of proof is on the defendant to demonstrate that two conspiracies are the same for double jeopardy purposes, *see United States v. Jones,* 816 F.2d 1483, 1486 (10th Cir.1987), he asks us to change this position in the light of decisions of other circuits. *See United States v. Ragins,* 840 F.2d 1184, 1191–92 (4th Cir.1988); *United States v. Inmon,* 568 F.2d 326, 329–32 (3d Cir.1977), *cert. denied,* 444 U.S. 859, 100 S.Ct. 121, 62 L.Ed.2d 79 (1979). Because a trial has already occurred in this case, we conclude that assignment of the burden of proof at the pretrial stage is no longer relevant to the resolution of the double jeopardy claim. Rather, we must simply address whether Sasser's convictions in this case violate the Double Jeopardy Clause. *See United States v. Ciancaglini,* 858 F.2d 923, 926 n. 3 (3d Cir.1988) ("The double jeopardy issue is not moot because a dispute remains between the parties as to whether appellant can be *convicted* for this offense. The double jeopardy issue would survive a trial.").

4. In *United States v. Puckett,* 692 F.2d 663 (10th Cir.), *cert. denied,* 459 U.S. 1091, 103 S.Ct. 579, 74 L.Ed.2d 939 (1982), *cert. denied,* 460 U.S. 1024 (1983), we explicitly decided to adhere to the *Blockburger* "same evidence" test, but we "recognize[d] that it has been criticized in recent years as an inadequate measurement of double jeopardy when applied to multiple prosecutions for conspiracy charges." *Id.* at 668. One of the appellants in *Puckett* urged us to abandon the "same evidence" test in favor of a "totality of the circumstances" test adopted in several other circuits for determining whether two separate conspiracies exist. *See, e.g., United States v. Benefield,* 874 F.2d 1503, 1506 (11th Cir.1989); *United States v. Liotard,* 817 F.2d 1074, 1078 & n. 7 (3rd Cir.1987). In this case, Sasser also suggests that we adopt a "totality of the circumstances" test. In *Puckett,* we concluded that "whether the 'totality of the circumstances' test or the 'same evidence' test [was] applied," the evidence indicated the existence of separate conspiracies. *Puckett,* 692 F.2d at 668.

We have held that "if two charges of conspiracy are in fact based on a defendant's participation in a single conspiracy, the former jeopardy clause bars the second prosecution." *United States v. Daniels,* 857 F.2d 1392, 1393 (10th Cir.1988). To determine whether Sasser participated in a single conspiracy or two separate conspiracies, "the focal point of the analysis is whether the alleged co-conspirators were united in a common unlawful goal or purpose." *United States v. Daily,* 921 F.2d 994, 1007 (10th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 405, 116 L.Ed.2d 354 (1991). "Of principal concern is whether the conduct of the alleged co-conspirators, however diverse and far-ranging, exhibits an interdependence." *Id.; United States v. Evans,* 970 F.2d 663, 671 (10th Cir.1992) (to show the necessary interdependence for a single conspiracy, "[w]hat is required is a *shared,* single criminal objective, not just similar or parallel objectives between similarly situated people").

After reviewing the indictments and the transcripts from both trials, we conclude that the earlier conspiracy involving the Garys (the *Gary* conspiracy) and the conspiracy in this case involving the Bizzells (the *Bizzell* conspiracy) simply cannot be construed as the same offense for double jeopardy purposes. In the *Gary* conspiracy, Sasser used his position as a loan officer at Talman to arrange for phony "strawbuyers" to take temporary title to certain properties owned by Bryn Gary. *See United States v. Sasser,* 971 F.2d 470 (10th Cir.1992). These transactions had the purpose of securing freely transferrable HUD–FHA insured financing that otherwise would be unavailable to Gary. Strawbuyers then re-transferred the properties to Gary without ever investing the amounts of their own funds that were falsely stated on the sale and loan application documents. *Id.* at 471–72.

In the *Bizzell* conspiracy, Sasser's role was that of purchaser of the properties. The Garys had no involvement. These differences alone suggests two distinct, independent conspiracies. To support his claim of interdependence, Sasser relies on the involvement of Mark McFerrin. In the

*Gary* conspiracy, McFerrin caused First Republic Trust Company to verify to Talman nonexistent accounts that strawbuyers purported to have at First Republic. In the *Bizzell* conspiracy, McFerrin had First Republic verify Sasser's non-existent certificate of deposit. The mere involvement of McFerrin and Sasser with both the Garys and the Bizzells does not establish interdependence. Rather, interdependence involves a determination of "whether the activities of [the] alleged co-conspirators in one aspect of the charged scheme were necessary or advantageous to the success of the activities of co-conspirators in another aspect of the charged scheme, or the success of the venture as a whole." *Daily,* 921 F.2d at 1007; *Evans,* 970 F.2d at 671 ("what is needed is proof that [the alleged conspirators] intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy").

The only evidence that the *Gary* conspiracy furthered the success of the *Bizzell* conspiracy is that without the commissions earned during the *Gary* conspiracy, Sasser could not have participated in the *Bizzell* conspiracy. This evidence alone cannot support a finding of interdependence because it does not show that the *Gary* conspiracy was designed to further and to promote the success of the *Bizzell* conspiracy. Instead, Sasser's argument merely demonstrates that his participation in one conspiracy provided him with funds to participate in another.

Sasser also has failed to demonstrate that any of the participants in the two conspiracies—besides Sasser himself and possibly McFerrin—had any knowledge that the other conspiracy existed. The two conspiracies operated independently of one another, with the success of each dependent exclusively on the individual labors of its own, separate participants. Thus, we conclude that under either the "totality of the circumstances" test or the "same evidence" test, the record demonstrates that two separate conspiracies existed and that Sasser's prosecution was not barred by the Double Jeopardy Clause. *See United States v. Puckett,* 692 F.2d 663, 668 (10th

Cir.), *cert. denied,* 459 U.S. 1091, 103 S.Ct. 579, 74 L.Ed.2d 939 (1982), *cert. denied,* 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 497 (1983).

## II.

Sasser contends that prosecution on the mail fraud count and the false statement counts is barred by the Double Jeopardy Clause. Sasser argues that the "scheme to defraud" element of the mail fraud offense, as described in Count 2, was previously prosecuted as an element of the conspiracy charged in the *Gary* case. Sasser also asserts that Counts 3–9 prosecute him for the formulation of a mental state that was an element of the conspiracy prosecuted in the *Gary* case. Essentially, Sasser once more contends that because only a single conspiracy existed—a conspiracy that encompassed his scheme to defraud and his false statements to HUD—his second prosecution violates the Double Jeopardy Clause. Because we conclude that two separate conspiracies existed, Sasser's argument is without merit. The mail fraud count and the counts alleging false statements to HUD in this case relate directly to Sasser's conspiracy with the Bizzells and do not in any way implicate his conspiracy with the Garys. Therefore, the Double Jeopardy Clause does not bar Sasser's prosecution under Count 2 and Counts 3–9.

## III.

 Sasser contends that the district court erred in submitting an instruction to the jury that authorized a finding of knowledge based on a conscious purpose to avoid learning the truth. To evaluate the adequacy of jury instructions, we examine them as a whole and apply a *de novo* standard of review to determine the propriety of tendering an individual jury instruction. *See United States v. Barbee,* 968 F.2d 1026, 1033 (10th Cir.1992); *United States v. de Francisco–Lopez,* 939 F.2d 1405, 1409 (10th Cir.1991); *United States v. Sanchez–Robles,* 927 F.2d 1070, 1073 (9th Cir.1991). We review the tender of a deliberate ignorance jury instruction in the light most favorable to the government.

*de Francisco–Lopez,* 939 F.2d at 1409; *United States v. Fingado,* 934 F.2d 1163, 1166 (10th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 320, 116 L.Ed.2d 262 (1991).

The district court gave the following instruction on "proof of knowledge":

The element of knowledge may be satisfied with proof that a person actually knew or was aware of something, as demonstrated by his words or actions, or by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him. A finding beyond a reasonable doubt of a conscious purpose to avoid learning the truth would permit an inference of knowledge. Stated another way, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of a fact.

It is entirely up to you as to whether you find any actual knowledge or awareness of deliberate closing of the eyes, and the inference to be drawn from such evidence, that is, whether such evidence indicates a consciousness of guilt or nothing at all. A showing of mere negligence or mistake is not sufficient to support a finding of knowledge.

Sasser asserts that this instruction impermissibly used the "deliberate ignorance" standard that we cautioned against in *de Francisco–Lopez,* 939 F.2d at 1410.

In *de Francisco–Lopez,* the defendant was convicted of possession with intent to distribute cocaine. The indictment stated "that he did 'knowingly and intentionally possess with intent to distribute approximately fifteen (15) kilograms of a mixture containing cocaine, a Schedule II controlled substance.'" *Id.* at 1407. The district court gave the following instruction:

The defendant's knowledge may be established by proof that the defendant was aware of a high probability that the materials were narcotics unless despite this high probability the facts show that the defendant actually believed that the materials were not narcotics. Knowledge that the material[s] were narcotics may be inferred from circumstances that

would convince an average ordinary person that this is the fact.

*Id.* at 1411 (alteration in original). Given the facts presented by the government, we concluded that this instruction was improper. We held that "the deliberate ignorance instruction must not be tendered to the jury unless evidence, circumstantial or direct, has been admitted to show that the defendant denies knowledge of the operant fact and the defendant's conduct includes deliberate acts to avoid actual knowledge of that operant fact." *Id.* at 1411.

Here, the government admits that it did not present evidence related to Sasser's knowledge that would support a deliberate ignorance instruction. The government states in its brief that "[a]ll the evidence was directed at proving that Sasser *actually knew* that the figures he stated on the relevant forms for his cash assets, for the cost of the properties, and for the amounts he was paying from own funds were false." However, the government contends that evidence related to the Bizzells and their knowledge of what false information Sasser placed on the HUD forms supported a deliberate ignorance instruction. Of course, evidentiary issues related to the Bizzells' knowledge are irrelevant to the issues raised by Sasser in this appeal. We need not delve into whether the evidence suggests that the Bizzells deliberately avoided learning the truth because we conclude that even if the district court erred by giving the deliberate ignorance instruction, that error clearly was harmless beyond a reasonable doubt as to Sasser. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) (harmless error occurs if "beyond a reasonable doubt [ ] the error complained of did not contribute to the verdict obtained").

In *Barbee,* we stated that, in determining whether giving a deliberate ignorance instruction was harmless, we must "look at the precise wording of the instruction given, whether the other instructions negate any adverse effects of the erroneous delib-

erate indifference instruction, and the quantum of evidence against the defendant." *Barbee,* 968 F.2d at 1033.

In *de Francisco–Lopez,* we crafted a bar on the deliberate ignorance instruction, absent supporting evidence, for two reasons. First, the "high probability" and "average ordinary person" language could suggest to the jury that a conviction based on mere negligence—rather than knowledge—was appropriate. *Id.* at 1410–11; *Barbee,* 968 F.2d at 1033. Second, we believed that the deliberate ignorance instruction might shift the burden to the defendant to prove his or her innocence. *de Francisco–Lopez,* 939 F.2d at 1411. Finally, after reviewing the record, we found that "none of the evidence presented at trial [was] sufficiently probative of the element of deliberation" to justify a deliberate ignorance instruction. *Id.*

The instruction in this case stands in stark contrast to the instruction given in *de Francisco–Lopez.* The *de Francisco–Lopez* instruction used the phrases "high probability" and "average ordinary person"—both of which imply an objective standard that possibly could lead a jury to conclude that the proper standard for conviction was negligence. In our instruction, there is no possibility that the jury could have applied an objective standard to convict Sasser. The instruction specifically employed a subjective standard—"that a defendant deliberately closed his eyes to what would otherwise have been obvious to him." Most importantly, the instruction was not of the "high probability" genre. Rather, this instruction used the phrase "willful blindness," stating that "a defendant's knowledge of a fact may be inferred from willful blindness to the existence of a fact." Not only did this instruction not imply a negligence standard, the district court explicitly told the jury—immediately following the willful blindness language—that "[a] showing of mere negligence or mistake is not sufficient to support a finding of knowledge." [5] Further, the district

---

5. We recognize that the jury in *de Francisco–Lopez* also was instructed that a finding of negligence would not be sufficient. *See de Francis-*

*co–Lopez,* 939 F.2d at 1419 (Baldock, J., dissenting). However, the jury was not given this

court made sure that this willful knowledge instruction would not shift the burden of proof by including—again within the language of the instruction itself—the statement that the jury must find "beyond a reasonable doubt [ ] a conscious purpose to avoid learning the truth" before it could infer knowledge. In *Barbee*, we reviewed an instruction identical in all material respects and concluded that "there was little risk that this jury convicted [the defendant] using a negligence or recklessness standard." *Barbee*, 968 F.2d at 1034. Likewise, we conclude that the "willful blindness" instruction in this case neither shifted the burden of proof nor allowed the jury to convict Sasser based on a negligence standard.

Most importantly, the government introduced detailed and substantial evidence demonstrating Sasser's actual knowledge of his fraudulent activity. The trial evidence clearly showed that Sasser actually knew that the statements he made regarding his cash assets, the cost of the properties, and the amounts he was paying from his own funds were fraudulent. "[B]ecause the jury was also instructed that it could convict based on a theory of actual knowledge, any error is harmless if there was sufficient evidence to support the convictions under that theory." *United States v. Rivera*, 944 F.2d 1563, 1572 (11th Cir. 1991).

Given the nature of the instruction discussed above, we have no difficulty in concluding that any error in this instruction could not have contributed to the verdict. *See Yates v. Evatt*, —— U.S. ——, ——, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991) (to conclude that an error did not contribute to the verdict, we must "find that the error [is] unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record"). The "willful blindness" instruction in this case does not implicate the concerns we expressed in *de Francisco–Lopez* concerning the "high probability" instruction. Moreover, based on the evidence presented, "a reasonable jury would be compelled to find

admonition within the deliberate ignorance in-

that [Sasser] had knowledge" of the falsity of statements in the HUD forms. *Barbee*, 968 F.2d at 1035. In conclusion, we hold that when sufficient evidence of a defendant's guilt exists, the tendering of a "willful blindness" instruction is harmless beyond a reasonable doubt even when the government does not introduce evidence to support such a theory.

## IV.

■ Sasser also argues that the district court erred in refusing two requested instructions supporting his defense that property sales prices stated in the HUD applications were literally correct. The first requested instruction provided that "[i]f a question can be interpreted in more than one way, the Government must show beyond a reasonable doubt that there is no reasonable interpretation of the response that would make it factually correct." The second instruction stated that "[t]he sales price that a buyer of real estate is legally obligated to pay is the price stated in the buyer's written contract with the seller." The government contends that these instructions were not justified because the evidence did not support such a defense theory. We agree.

Sasser contends that because the price in the parties' written sales contract was the only valid price under Oklahoma law, the HUD loan applications could be interpreted as seeking the price as stated in the written contract. Sasser argues that the jury reasonably could have concluded that the loan applications required Sasser to provide the price stated in the sales contract—regardless of whether that price was inflated or fraudulent. Thus, under *United States v. Diogo*, 320 F.2d 898 (2d Cir.1963), Sasser asserts that the district court erred in declining to give his two instructions to the jury.

In *Diogo*, the defendants were charged with entering into sham marriages with American citizens in order to obtain non-quota immigrant status under 8 U.S.C. § 1101(a)(27)(A). In reversing the defen-

struction itself.

dants' convictions under 18 U.S.C. § 1001 for false statements, the court found that although the marriages were not "marriages" within the meaning of the statute that allowed aliens to enter, they were valid marriages under the laws of New York, where the defendants resided. The Second Circuit was faced with deciding whether the government "established that the statements of each appellant regarding his marital status were false, and that these statements were known by the appellants to be false at the time they were made." *Id.* at 903. The court held that "so long as falsity is an element of a criminal prosecution for false representations with respect to one's marital status ... the validity of the marriage will be material to such a prosecution." *Id.* at 905. Because the government did not prove the invalidity of the marriages under state law, the court reversed the false statement convictions and stated that "it is incumbent upon the Government to negative any reasonable interpretation that would make the defendant's statement factually correct." *Id.* at 907.

Here, Sasser contends that the district court should have given an instruction allowing the jury to determine whether he reasonably could have interpreted the HUD application as requiring that an applicant provide the purchase price specified in the sales contract. The HUD application requires that the applicant state the "cost" of the property and the "contract purchase price." We cannot conceive of any reasonable interpretation that would support Sasser's argument. Sasser, an experienced loan officer, would have us believe that he reasonably could have misunderstood the form to require that he state a fictitious sales price in the HUD application simply because he fraudulently had inserted this same price term in the contract of sale. Sasser presented no evidence that he misunderstood the government forms in this fashion. Indeed, Sasser only introduced evidence suggesting that the purchase price stated in the contracts of sale were factually accurate, that he earned commissions from the Bizzells on the sale of each property, and that the commissions were credited to him at the closing to provide his cash investment in the properties.

"A defendant is entitled to an instruction on a theory of defense if it is legally sound and supported by the evidence presented at trial." *United States v. Ratchford,* 942 F.2d 702, 707 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1185, 117 L.Ed.2d 427 (1992). After reviewing the evidence, and the HUD applications in particular, we conclude that Sasser's defense is not legally sound and is not supported by the evidence presented at trial.

V.

Sasser argues that the district court erred in permitting his conviction based on concealment of material facts. According to the indictment, false or fraudulent misrepresentations allegedly were made on several HUD forms, including applications for certificate of commitment and settlement statements. Sasser argues that these HUD forms did not bear current control numbers issued by the Office of Management and Budget (OMB) and, therefore, he cannot be penalized for failing to provide information in response to these forms.

Section 3512 of Title 44 of the United States Code (the Paperwork Reduction Act) provides,

> Notwithstanding any other provision of law, no person shall be subject to any penalty for failing to maintain or provide information to any agency if the information collection request involved was made after December 31, 1981, and does not display a current control number assigned by the Director, or fails to state that such request is not subject to this chapter.

In *United States v. Weiss,* 914 F.2d 1514, 1522 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2888, 115 L.Ed.2d 1053 (1991), the Second Circuit held that this section of the Paperwork Reduction Act only protects individuals who fail to file information. It does not protect those who file false information. *Id.; see also United States v. Collins,* 920 F.2d 619, 630 n. 13 (10th Cir.1990), *cert. denied,* —— U.S. ——,

111 S.Ct. 2022, 114 L.Ed.2d 108 (1991). Thus, if Sasser filed false information, whether the forms contained current OMB numbers is irrelevant.

Here, the record reveals that Sasser did indeed file false information. On various HUD forms, Sasser falsely stated his cash assets, falsely stated the cost of the properties, and falsely stated that a certain amount of his own funds would be used to complete the purchase. Sasser contends that the government introduced evidence that he failed to disclose information to HUD and that the jury could have premised its guilty verdict on such a failure. He further asserts that this "failure to disclose" evidence implicates the Paperwork Reduction Act. We disagree. Any "failure to disclose" evidence introduced by the government served only to refute defense evidence. The evidence and arguments forwarded by the government to prove Sasser's guilt related to Sasser's affirmative false statements on forms submitted to HUD. Thus, because § 3512 does not protect an individual against prosecution for making false statements on government forms, Sasser's conviction cannot be reversed on this ground.

## VI.

■ Sasser claims that the district court erred in authorizing a mail fraud conviction based solely on the foreseeability of the alleged mailing, rather than on actual knowledge. The district court gave the following instruction to the jury:

The use of the United States mails in furtherance of the scheme to defraud is an essential element of this offense charged in the indictment, but it is not necessary that the item mailed show on its face that it was mailed in furtherance of the scheme, or that the defendant Hiram Stanley Sasser did any actual mailing, or that the participants in the fraud specifically intended that the mails be used. It is sufficient if the mails

were in fact used to carry out the scheme and if the use of the mails by a participant or somebody else was reasonably foreseeable.

Sasser asserts that the "reasonably foreseeable" language does not comport with the statutory requirement that the defendant "knowingly causes" use of the mails in furtherance of a scheme to defraud. *See* 18 U.S.C. § 1341.

Section 1341 "makes it a crime for any person to mail or to knowingly cause to be delivered by mail any matter for the purpose of executing a scheme to defraud." *United States v. Pisciotta,* 469 F.2d 329, 330 (10th Cir.1972). Thus, to obtain a conviction under § 1341, the government must establish two elements: "(1) a scheme to defraud, and (2) the mailing of some material for the purpose of executing the scheme." *Id.; see also United States v. Taylor,* 832 F.2d 1187, 1192 (10th Cir.1987). Here, Sasser contends that the district court erred in instructing the jury on the scienter requirement for the second element.

In *Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954), the Supreme Court—interpreting § 1341—stated that "[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Id.* at 8–9, 74 S.Ct. at 363; *see also United States v. Hollis,* 971 F.2d 1441, 1448 (10th Cir.1992) (applying reasonable foreseeability test to "knowingly caused" standard of § 1341); *Pisciotta,* 469 F.2d at 331. Thus, the district court appropriately instructed the jury that a finding of reasonable foreseeability of the mailing was sufficient for a conviction under the statute.[6]

## VII.

Sasser argues that the district court erred in permitting questioning about his

---

**6.** Sasser argues that Sixth Circuit's decision in *United States v. Schankowski,* 782 F.2d 628 (6th Cir.1986), should be controlling here. However, *Schankowski* involved the interpretation of a

different statute, 18 U.S.C. § 1701, and the language "knowingly and willfully." Therefore, the Sixth Circuit's opinion is inapposite.

refusal to speak to government investigators and about his failure to offer evidence to HUD investigators of the existence of the $50,000 certificate of deposit that he listed on a HUD form as a cash asset. Sasser contends that the prosecution's questioning constituted impermissible adverse comments on the exercise of his Fifth Amendment right against self-incrimination.[7]

 During the prosecution's case-in-chief, the following colloquy occurred between the prosecutor and the HUD investigator:

Q: Now, after the interview, did you talk again with Mr. Sasser?

A: Not about the loans. No.

Q: Why not?

A: Mr. Dennis [Sasser's superior at Talman] told us that Mr. Sasser no longer wished to talk to us, that anything we needed to talk to him about he wanted in writing and to contact—[Defense Objection]

After the objection, the district court stated that "the status of it at the moment is, I think, not troublesome." Sasser contends, based on *United States v. Burson*, 952 F.2d 1196 (10th Cir.1991), *cert. denied* — U.S. ——, 112 S.Ct. 1702, 118 L.Ed.2d 411 (1992), that the prosecution's questions and the ruling that permitted the questions infringed on his Fifth Amendment rights. We disagree.

In *Burson*, we addressed a similar situation. During an investigation by the Internal Revenue Service (IRS), two IRS agents arrived at Burson's residence, but soon left when it became apparent that Burson would not cooperate or answer any of their questions. At Burson's trial, the prosecutor asked both agents if Burson had responded to the agents' questions concerning his and another individual's tax affairs. The agents each stated that Burson did not respond. We first recognized that "[t]he privilege against self-incrimination can be asserted in any investigatory or adjudicatory proceeding." *Id.* at 1200 (citing *Kasti-*

*gar v. United States*, 406 U.S. 441, 444, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972)). We then concluded that Burson invoked his privilege against self-incrimination and "that once a defendant invokes his right to remain silent, it is impermissible for the prosecution to refer to any Fifth Amendment rights which defendant exercised." *Id.* at 1200–01.

In contrast to *Burson*, this first colloquy does not implicate Sasser's Fifth Amendment right to remain silent. Sasser, unlike Burson, never *personally* informed the agents that he did not wish to speak with them. Instead, Sasser's supervisor at Talman told the HUD agents that Sasser no longer wished to talk with them. The Fifth Amendment privilege against self-incrimination is a personal privilege. *See Couch v. United States*, 409 U.S. 322, 328, 93 S.Ct. 611, 616, 34 L.Ed.2d 548 (1973) ("The Constitution explicitly prohibits compelling an accused to bear witness 'against himself': it necessarily does not proscribe incriminating statements elicited from another."). The privilege simply could not be invoked by Sasser's supervisor. Thus, the prosecution did not impermissibly comment on Sasser's invocation of his right to remain silent.

 Sasser also asserts that the HUD investigator's testimony that Sasser never provided documents related to his claimed $50,000 certificate of deposit in response to a subpoena violated his Fifth Amendment privilege against self-incrimination. At trial, the prosecution adduced the following testimony from a HUD investigator:

Q: Directing you to August the 12th, can you tell the members of the jury what happened on that date with respect to the sequence of events in the—your audit of these seven loans?

A: On August the 12th, Mr. Sasser and Mr. Johnson and Mr. Strickland came to the HUD office in response to the subpoena we had issued.... At that time, we were furnished some docu-

---

**7.** The Fifth Amendment of the Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."

mentation. Although not all the documentation we had asked—requested was furnished, what they had provided us with, as far as the CD, the 50,000 certificate of deposit from First Republic Trust that we had asked for them to show ownership of, they provided a [sic] opinion from the trust company as. to what a trust company could or could not do. We received no documentation to show ownership of the CD.

\* \* \* \* \* \*

Q: Ms. Howell, at that time or at any date thereafter, to your knowledge even as of today, July the 26th, has HUD audit ever received any evidence of ownership, any evidence of the existence from that man of a $50,000 certificate of deposit from First Republic Trust in Dallas?

[Sasser objection overruled.]

A: To the best of my knowledge, we have not received any documentation to show the ownership of a 50,000 CD in the First Republic Trust or that a $50,000 certificate of deposit ever existed in the name of Stan Sasser.

The government asserts that this testimony did not relate to any exercise of a Fifth Amendment privilege. The government argues that production of the subpoenaed documents would not have had any testimonial aspect with an incriminating effect and, therefore, is not entitled to Fifth Amendment protection.

On several occasions, the Supreme Court has recognized that production of documents or physical objects has a testimonial or communicative aspect independent of the contents of the thing produced. In *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), the government sought to compel production of accountants' documents that were in the possession of the attorneys of taxpayers who were under investigation for possible civil or criminal liability under federal tax laws. The Supreme Court stated that "the Fifth Amendment would not be violated by the fact alone that the papers on their face might incriminate the taxpayer, for the privilege protects a person only against

being incriminated by his own compelled testimonial communications." *Id.* at 409, 96 S.Ct. at 1580. However, the Court noted that

[t]he act of producing evidence in response to a subpoena nevertheless has communicative aspects of its own, wholly aside from the contents of the papers produced. Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the taxpayer. It also would indicate the taxpayer's belief that the papers are those described in the subpoena.

*Id.* at 410, 96 S.Ct. at 1581. In *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984) [*Doe I*], the Supreme Court revisited the issue of whether the act of producing a document could itself be incriminating. The Court stated that "[a]lthough the contents of a document may not be privileged, the act of producing the document may be. A government subpoena compels the holder of the document to perform an act that may have testimonial aspects and an incriminating effect." *Id.* at 612, 104 S.Ct. at 1242 (citations omitted).

In *Baltimore City Department of Social Services v. Bouknight*, 493 U.S. 549, 110 S.Ct. 900, 107 L.Ed.2d 992 (1990), the Court faced the issue of whether a woman, the mother and legal custodian of a child, could invoke her Fifth Amendment privilege against self-incrimination to resist a court order to produce the child. The Court began its analysis by noting that "[w]hen the government demands that an item be produced, 'the only thing compelled is the act of producing the [item].'" *Id.* at 554–55, 110 S.Ct. at 905 (quoting *Fisher*, 425 U.S. at 410 n. 11, 96 S.Ct. at 1580 n. 11) (alteration in *Bouknight*). The Court then stated that "[t]he Fifth Amendment's protection may nonetheless be implicated because the act of complying with the government's demand testifies to the existence, possession, or authenticity of the things produced." *Id.* Bouknight claimed that the contempt order requiring production of the child violated her Fifth Amendment right to remain silent because "the act of

production would amount to testimony regarding her control over and possession of [her child]." *Id.* The Court subsequently rejected this argument and concluded that "Bouknight may not invoke the privilege to resist the production order because she has assumed custodial duties related to production and because production is required as part of a noncriminal regulatory regime." *Id.*

In light of the above discussion, this case presents a somewhat unique situation. Here, HUD requested documents that would verify the existence of the $50,000 certificate of deposit. Sasser never produced any documents, and HUD never sought to compel their production. At trial, over objection, the prosecution then introduced Sasser's failure to produce the documents as evidence of his guilt—as evidence that the certificate of deposit did not exist. We must decide whether this evidence—testimony of Sasser's failure to produce potentially exculpatory documents—infringed upon Sasser's Fifth Amendment privilege against self-incrimination. We conclude that it did.

In *United States v. Karp,* 484 F.Supp. 157 (S.D.N.Y.1980), the court faced a similar issue. The government charged the defendant "with conspiracy to defraud the Internal Revenue Service by creating fictitious business transactions to be used by other taxpayers." *Id.* at 158. To establish that the transactions were in fact fictitious, the government attempted to prove that the transactions were not supported by any valid documentation. To this end, the government sought to compel the defendant, pursuant to a subpoena, to produce documents supporting these transactions. The district court denied the government's request on the ground that if the documents did not exist, "the only way the defendant could avoid the risk of being jailed for contempt would be to assert their nonexistence, which is precisely the fact that the government wishes to establish at trial." *Id.* at 158. The court held that "a purpose of the Fifth Amendment [is] to avoid this dilemma." *Id.*

In *United States v. Barth,* 745 F.2d 184 (2d Cir.1984), *cert. denied,* 470 U.S. 1004, 105 S.Ct. 1356, 84 L.Ed.2d 378 (1985), the Second Circuit addressed whether a president of a corporation could be compelled to testify that he did not possess tax returns sought by the IRS. The defendant was being investigated for failure to file individual and corporate federal income tax returns. The court held that the defendant's "admission that he did not possess these returns would 'furnish a link in the chain of evidence needed to prosecute [Barth] for a federal crime' and therefore, would be potentially self-incriminating." *Id.* at 187 (quoting *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951)) (citations omitted). Accordingly, based on the defendant's Fifth Amendment rights, the Second Circuit held that the defendant's testimony could not be compelled.

After reviewing the testimony in this case, we conclude that the prosecution impermissibly commented on Sasser's exercise of his privilege against self-incrimination. In this case, it was essential for the government to prove that the certificate of deposit did not exist. As a first step in their case, the government attempted to subpoena any documents that Sasser could produce that related to the existence of the certificate of deposit. At this point, Sasser faced a difficult dilemma—either fail to comply with the subpoena or state that he did not have the documents. Sasser chose to remain silent and did not comply with the subpoena, and the government never attempted to force him to comply.

Instead, the government introduced his failure to comply as evidence that the certificate of deposit never existed. The prosecutor asked, "[H]as HUD audit ever received any evidence of ownership, any evidence of the existence from that man of a $50,000 certificate of deposit from First Republic Trust in Dallas?" This question clearly was impermissible. The Fifth Amendment's protections are implicated when "the act of complying with the government's demand testifies to the existence, possession, or authenticity of the things produced." *Bouknight,* 493 U.S. at

555, 110 S.Ct. at 905. The act of complying with the subpoena—perhaps in this case admitting the lack of supporting documentation—would have forced Sasser to communicate evidence suggesting that the certificate of deposit did not exist. In other words, Sasser would have been compelled to give evidence against himself. By not complying, Sasser chose to remain silent pursuant to the Fifth Amendment. The government's questions then impermissibly attempted to use Sasser's silence as evidence against him.

■ Although we conclude that the government violated Sasser's Fifth Amendment privilege against self-incrimination, we still must decide whether this error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). "*Chapman* dictates the beneficiary of a constitutional error must prove beyond a reasonable doubt the error complained of did not contribute to the guilty verdict." *Burson*, 952 F.2d at 1201. We use five factors to determine whether a comment concerning the defendant's silence is harmless beyond a reasonable doubt:

"1. The use to which the prosecution puts the ... silence.

"2. Who elected to pursue the line of questioning.

"3. The quantum of other evidence indicative of guilt.

"4. The intensity and frequency of the reference.

"5. The availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions."

*Id.* at 1201 (quoting *United States v. Massey*, 687 F.2d 1348, 1353 (10th Cir.1982)). Using these factors, we must decide whether, beyond a reasonable doubt, the jury would have returned a verdict of guilty regardless of the prosecutor's impermissible questioning about Sasser's failure to produce exculpatory evidence.

The first two factors weigh heavily in favor of Sasser. The prosecution elected to pursue the line of questioning and also used Sasser's silence to establish his guilt. Further, the evidence, unlike in the *Burson* case, was highly probative—it helped to establish that Sasser did not possess the certificate of deposit. Turning briefly to the fifth factor, we conclude that it weighs in neither Sasser's nor the government's favor. Although the district court had the opportunity to prevent the testimony, it did not do so. The court did, however, give a curative instruction, but one that only generally admonished the jury that Sasser's silence could not be used against him. This instruction was too general to cure, by itself, the prosecution's error in revealing Sasser's failure to produce evidence.

The third and fourth factors, however, weigh heavily in favor of the prosecution. First, the intensity and frequency of the references to Sasser's failure to produce evidence were minimal. The prosecution only elicited information concerning the subpoena on two occasions, closely related in time, in a lengthy trial. Further, only brief mention was made of evidence in the prosecution's closing argument. Second, and most importantly, the government introduced other evidence that unquestionably demonstrates Sasser's guilt. The government introduced testimony that showed that First Republic Trust Company was dormant at the time, never had authority to issue certificates of deposit, and never issued any certificates of deposit. It also demonstrated, through testimony by Sasser's tax accountant, that Sasser never reported interest from any such certificate of deposit on his 1985 or 1986 tax returns. Moreover, Sasser failed to disclose any comparably sized asset on an application to refinance his personal home filed several months prior to the date Sasser claimed to own the certificate of deposit. Finally, the government showed that Sasser never filed a claim with the State liquidator to recover $50,000 from First Republic Trust, even though he maintained that the funds had been embezzled by that company.

After reviewing this evidence, we conclude that it establishes Sasser's guilt beyond a reasonable doubt. The evidence related to First Republic Trust Company alone demonstrates that the certificate of deposit did not exist. Although we disap-

prove of the prosecution's actions in this case, given the ample evidence that Sasser never possessed a certificate of deposit for $50,000, we must conclude that the prosecution's actions were harmless beyond a reasonable doubt.

## VIII.

■ Sasser contends that his conspiracy conviction must be vacated due to insufficient evidence of the existence of a coconspirator. " 'Evidence is considered sufficient to support a criminal conviction if, when viewed in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.' " *Ratchford*, 942 F.2d at 703 (quoting *United States v. Culpepper*, 834 F.2d 879, 881 (10th Cir.1987)). Sasser's contention rests on the fact that—although the jury found him guilty of the conspiracy charge—the jury could not reach a verdict on the conspiracy count with regard to his alleged coconspirators, the Bizzells. Sasser asserts that, under *Romontio v. United States*, 400 F.2d 618, 619 (10th Cir.1968), *cert. dismissed*, 402 U.S. 903, 91 S.Ct. 1384, 28 L.Ed.2d 644 (1971), the jury's inability to reach a verdict with regard to the Bizzells demonstrates that the jury's verdict was inconsistent and that no reasonable jury could conclude beyond a reasonable doubt that a conspiracy existed.

In *Romontio*, the defendant was convicted of conspiracy, and his three codefendants were acquitted. We held that the conspiracy conviction had to be reversed because "[t]he conspiracy statute, 18 U.S.C. § 371, by its express language and by the very nature of the offense requires some concert of plan and purpose between two or more persons." *Id.* at 619 (footnote omitted). The distinction between our case and *Romontio* is an obvious one—Sasser's codefendants were not acquitted. In *United States v. Howard*, 751 F.2d 336, 338 (10th Cir.1984), *cert. denied*, 472 U.S. 1030, 105 S.Ct. 3507, 87 L.Ed.2d 638 (1985), we held that the rule announced in *Romontio* applies only when the alleged coconspirators are *acquitted.*

In *United States v. Sangmeister*, 685 F.2d 1124 (9th Cir.1982), the Ninth Circuit faced this precise issue. In *Sangmeister*, a jury convicted the defendant of conspiracy to distribute cocaine, but failed to reach a verdict with respect to the defendant's alleged coconspirator. The Ninth Circuit noted that "in situations in which only one conspirator is brought to trial or the conspirators are tried separately, the conviction of the other conspirator may stand." *Id.* at 1126–27. The court also recognized that a jury can find a defendant guilty of conspiracy if sufficient evidence of unnamed and unindicted coconspirators exists and that a conspiracy conviction may stand against a defendant even if the prosecution dismisses charges against the alleged coconspirator. *Id.* at 1127. The Ninth Circuit concluded that "the failure of a jury to reach a verdict is more properly viewed as a non-event" because " 'neither guilt nor innocence of the co-conspirator ha[s] been established.' " *Id.* (quoting *United States v. Shipp*, 359 F.2d 185, 189 (6th Cir.), *cert. denied*, 385 U.S. 903, 87 S.Ct. 213, 17 L.Ed.2d 134 (1966)). Thus, the court did not face inconsistent verdicts because a "hung jury is the failure of the jury to reach a verdict as to the coconspirator." *Id.*

The District of Columbia Circuit reached the same conclusion in a similar situation. In *United States v. Dakins*, 872 F.2d 1061 (D.C.Cir.), *cert. denied*, 493 U.S. 966, 110 S.Ct. 410, 107 L.Ed.2d 375 (1989), the defendant was convicted of conspiracy to possess with intent to distribute cocaine. The prosecution dismissed the charges against the defendant's alleged coconspirators after the jury could not reach a verdict. Agreeing with the Ninth Circuit's decision in *Sangmeister*, the court concluded that "[g]iven the lack of verdict on Dakins' codefendants, there stands no verdict with which the Dakins verdict could be said to be inconsistent." *Id.* at 1065.

We agree with the reasoning of both the Ninth Circuit and the District of Columbia Circuit. The failure of the jury to return a verdict on Sasser's coconspirators must be viewed as a nonevent that in no way affects Sasser's conviction for conspiracy.

Because the jury did not acquit the Bizzells, an inconsistent verdict with regard to Sasser does not exist. Our holding in *Romontio* simply does not apply to the situation where a jury returns a guilty verdict as to one coconspirator, but is unable to reach a verdict as to the other alleged coconspirators.

As an additional ground for sustaining Sasser's conspiracy conviction, the government argues that our holding in *Romontio* is overruled by the Supreme Court's decision in *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). In *Powell*, the Supreme Court stated that "where truly inconsistent verdicts have been reached, '[t]he most that can be said ... is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.'" *Powell*, 469 U.S. at 64–65, 105 S.Ct. at 476 (quoting *Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932)) (alterations in *Powell*). The Court concluded that "[t]he fact that the inconsistency may be the result of lenity, coupled with the Government's inability to invoke review, suggests that inconsistent verdicts should not be reviewable." *Id.*, 469 U.S. at 66, 105 S.Ct. at 477. The Court also noted that "a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts." *Id.* at 67, 105 S.Ct. at 478. Because we conclude that this case does not present us with a situation where we have inconsistent verdicts, we do not address whether *Powell* overrules our decision in *Romontio*.[8]

### IX.

██ Sasser contends that the district court lacked jurisdiction to change Sasser's sentence after his notice of appeal had been filed. Sasser argues that once he filed his notice of appeal, the district court lacked jurisdiction to file an amended judgment and commitment order. The government asserts that the written order contained a clerical error that the district court was allowed to correct pursuant to Fed. R.Crim.P. 36. We agree.

Rule 36 provides that "[c]lerical mistakes in judgments, orders or other parts of the record and errors in the record arising from oversight or omission may be corrected by the court at any time and after such notice, if any, as the court orders." The written judgment in this case originally provided that Sasser was sentenced to four years on each of counts 1 and 2, with no requirement that these sentences be served consecutively to any other sentence. After Sasser filed his notice of appeal, the district court subsequently amended the written judgment to provide that the sentences would be served consecutively to any other sentence.

The transcript of the sentencing hearing unambiguously reveals that the district court intended the sentences to run consecutively. The district court stated,

> Said differently, four years on each of Counts One and Two; two years on each of Counts Three through Nine, to run concurrently; but all to run consecutive to the order of imprisonment imposed by—of one year imposed by Judge West in a previous case [the *Gary* case] but that has not yet been served.

Rule 36 allows the district court to correct such a clerical error "at any time." When the district court amended the judgment

---

**8.** Other circuits have addressed this same issue and have concluded that *Powell* indicates that acquittals of co-conspirators do not require reversal of the conviction of the lone convicted conspirator. *See United States v. Zuniga–Salinas*, 952 F.2d 876 (5th Cir.1992) (en banc); *United States v. Bucuvalas*, 909 F.2d 593, 597 (1st Cir.1990); *United States v. Thomas*, 900 F.2d 37, 40 (4th Cir.1990); *United States v. Andrews*, 850 F.2d 1557, 1561 (11th Cir.1988) (en banc), *cert.* *denied*, 488 U.S. 1032, 109 S.Ct. 842, 102 L.Ed.2d 974 (1989); *United States v. Valles–Valencia*, 823 F.2d 381 (9th Cir.1987). *See also United States v. Dakins*, 872 F.2d 1061, 1065 (D.C.Cir.) ("We interpret [*Powell*] if not to preclude such a rule, at least to cast doubt upon it."), *cert. denied*, 493 U.S. 966, 110 S.Ct. 410, 107 L.Ed.2d 375 (1989). *Cf. United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 475 (10th Cir.1990).

after the notice of appeal was filed, it simply followed Rule 36 and corrected a clerical error. Further, "[i]t is a firmly established and settled principle of federal criminal law that an orally pronounced sentence controls over a judgment and commitment order when the two conflict." *United States v. Villano*, 816 F.2d 1448, 1450 (10th Cir.1987) (en banc); *see also United States v. Khoury*, 901 F.2d 975, 977 (11th Cir. 1990) (if "there is a discrepancy between the orally imposed sentence and the written order of judgment and committal, the oral sentence controls"); *United States v. McAfee*, 832 F.2d 944, 946 (5th Cir.1987) ("The terms of an oral pronouncement that clearly provide for a consecutive or concurrent sentence control a contrary, silent or ambiguous written judgment."); *Johnson v. Mabry*, 602 F.2d 167, 170 (8th Cir.1979) ("the oral sentence pronounced by the sentencing judge constitutes the judgment, and anything inconsistent with the judgment which is included in a commitment order is a nullity"). Therefore, we conclude that the district court ordered that Sasser's sentence in this case be served consecutively to his sentence in other cases. The district court's amendment of the written judgment was simply the correction of a clerical error, as allowed "at any time" by Rule 36.

AFFIRMED.

SEYMOUR, Circuit Judge, concurring.

I join the opinion in this case but I write separately to emphasize an important point. As the majority notes, the government has admitted that it presented "no evidence of guilt that might come under the rubric of 'conscious avoidance.'" Brief of Appellee at 24; *see* maj. op. at 1552. This court has held unequivocally that the giving of a deliberate indifference instruction is error when, as here, there is no evidence showing that the defendant deliberately acted to avoid actual knowledge. *See United States v. Barbee*, 968 F.2d 1026, 1033 (10th Cir.1992); *United States v. de Francisco–Lopez*, 939 F.2d 1405, 1408–12 (10th Cir.1991); *United States v. Manriquez Arbizo*, 833 F.2d 244, 248–49 (10th Cir.1987). Giving the instruction in

this case was therefore clearly error, and the majority opinion can not be read to say otherwise.

I also agree with the majority's conclusion that the erroneous giving of this instruction was harmless. As we pointed out in *Barbee*, "[t]he concern with a deliberate indifference instruction is that it may lead a jury to convict a defendant for his or her negligence instead of for willfulness or intent." 968 F.2d at 1033. The form of the instruction given here, together with the substantial evidence of Sasser's *direct* knowledge of his fraudulent activity, convinces me that under *Barbee* the error was harmless. *See id.* at 1035 (overwhelming evidence of actual, direct knowledge renders erroneous deliberate indifference instruction harmless). Accordingly, I concur.