**UNITED STATES of America, Plaintiff,**

v.

**Larry D. HUDSON, Defendant.**

**No. 92–20030–01.**

United States District Court,
D. Kansas.

Jan. 15, 1993.

Tanya J. Treadway, Asst. U.S. Atty., for U.S.

James L. Eisenbrandt, Bryan & Caves, Overland Park, KS, for defendant.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, District Judge.

This matter is before the court on the post-trial motions of defendant Larry D. Hudson to dismiss based on variance from the indictment (Doc. # 85); for a new trial (Doc. # 87); and for judgment of acquittal (Doc. # 89). Also before the court is the government's motion to strike defendant's supplemental memorandum in support of post-trial motions (Doc. # 111).

On April 22, 1992, the defendant was indicted by the grand jury. Count 1 of the indictment charged the defendant with making materially false statements to the Federal Deposit Insurance Corporation ("FDIC") about his financial condition during a debtor's examination in violation of 18 U.S.C. § 1001. Count 2 charged the defendant with concealing, or causing to be concealed, material facts about his financial condition from the FDIC in violation of 18 U.S.C. §§ 2(b) and 1001. Count 3 charged the defendant with causing a false statement to be made to the FDIC during settlement negotiations in violation of 18 U.S.C. §§ 2(b) and 1007.

The case was tried to a jury, which on September 30, 1992, returned a verdict of guilty on all three counts and a special verdict of guilty on each statement specifically set forth in Count 1 (paragraphs 11(a)-(d)) of the indictment). Defendant has moved for dismissal for a variance from the indictment, judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c), or for a new trial pursuant to Rule 33. The government has responded to the defendant's motions; the parties orally argued the motions at a hearing on December 7, 1992, and the court is now prepared to rule.

### I. Motion to Dismiss for Variance from the Indictment

Hudson seeks dismissal of the indictment as to Count 1 on the ground that

the evidence produced at trial constructively amended the charges against him and allowed the jury to convict him of an offense other than that charged, thus violating his Fifth and Sixth Amendment rights. Trying a defendant on charges not made in the indictment is prohibited. *Stirone v. United States*, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960). "An indictment is constructively amended if the evidence presented at trial, together with the jury instructions, raises the possibility that the defendant was convicted of an offense other than that charged in the indictment." *United States v. Apodaca*, 843 F.2d 421, 428 (10th Cir.), *cert. denied*, 488 U.S. 932, 109 S.Ct. 325, 102 L.Ed.2d 342 (1988). "The specific inquiry is whether the jury was permitted to convict the defendant upon 'a set of facts distinctly different from that set forth in the indictment.'" *Hunter v. State of New Mexico*, 916 F.2d 595, 599 (10th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1693, 114 L.Ed.2d 87 (1991) (quoting *United States v. Chandler*, 858 F.2d 254, 257 (5th Cir.1988)).

■ Not all variances are fatal. Simple variances are generally upheld under the harmless error standard "'as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment.'" *Hunter*, 916 F.2d at 598–99 (quoting *United States v. Miller*, 471 U.S. 130, 136, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985)). In order for a variance to rise to the level of a constructive amendment, the variance must "effectively alter the substance of the indictment." *Hunter*, 916 F.2d at 599. Such a variance is reversible per se. *Apodaca*, 843 F.2d at 428.

■ In the instant case, the evidence at trial proved facts specifically alleged in the indictment in addition to facts entirely consistent with the allegations in the indictment and with the government's burden of proving specific intent. *See United States v. Gold*, 743 F.2d 800, 813 (11th Cir.1984), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985) (absent a demonstration that the defendant was prejudiced, proof of acts not specifically mentioned in

the indictment does not constructively amend the indictment).

Count 1 of the indictment charged that the defendant "misrepresented his financial condition ... by understating his assets and overstating his liabilities, including the following misrepresentations [paragraphs 11(a)–11(d) ]." The jury was allowed to consider not only the four specific statements outlined in paragraphs 11(a)–(d) of the indictment, but also statements about the defendant's interest in an airplane and in the St. Louis cable franchise and about a note receivable owed to KLDH–TV. The evidence of these other statements was admitted under Federal Rule of Evidence 404(b) to show the defendant's intent and the absence of mistake or accident. The jury was so instructed.

The jury returned a special verdict specifically finding the defendant guilty as to each of the statements set forth in paragraphs 11(a)–11(d) of the indictment. Thus, the defendant's assertion that evidence of other false statements constructively amended the indictment because it permitted the jury to convict him on statements other than those set forth in the indictment is inapposite. Even if the jury disregarded the court's instruction limiting the purpose for which these other statements could be considered, the special verdict form clearly established that the defendant's conviction on Count 1 was based on not one, but four, findings that the defendant made the specific affirmative misrepresentations set forth in the indictment.

The defendant offers *United States v. Lambert*, 501 F.2d 943 (5th Cir.1974), in support of his assertion that an impermissible variance occurred. *Lambert* is distinguishable. The instant case does not involve paraphrasing of the defendant's statements in the manner condemned by the *Lambert* court. Rather, the evidence of the defendant's statements in this case consisted mainly of a lengthy tape recording of the actual debtor's exam. This is not a case where the government's paraphrase of the defendant's statements "put words into his mouth." Defendant's motion to dismiss because of a constructive

amendment to the indictment is, therefore, denied. To the extent that defendant's motion for a new trial is premised on this same variance argument, it is also denied.

## II. Motion for a New Trial

■ In considering a motion for a new trial, the court has broad discretion. *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir.1987). Federal Rule of Criminal Procedure 33 provides that the court may grant a new trial "if required in the interest of justice." However, new trials are disfavored and we should use great caution in granting them. *See United States v. Gleeson*, 411 F.2d 1091, 1093 (10th Cir.1969); *United States v. Allen*, 554 F.2d 398, 403 (10th Cir.) *cert. denied*, 434 U.S. 836, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977).

### A. Jury Instructions

■ Initially, we address the defendant's argument that numerous jury instructions were given in error. Jury instructions are to be reviewed in their entirety to determine whether, when examined in light of the whole record, they fairly, adequately, and correctly state the governing law to provide the jury with "an ample understanding of the applicable principles of law and factual issues confronting them." *United States v. Denny*, 939 F.2d 1449, 1454 (10th Cir.1991). An error in jury instructions will cause a new trial only when the error is "prejudicial in light of the entire record." *Id.*

■ Defendant contends that instruction 12, permitting the jury to disregard the corporate form of the defendant's business organizations was improper because there was no evidence to support it. *See Smith v. Mill Creek Court, Inc.*, 457 F.2d 589, 592 (10th Cir.1972) (it is error to give an instruction in the absence of evidence on the issue). We disagree. The defendant did present substantial evidence that the corporate formalities were always strictly adhered to in his corporations. However, the

government also presented evidence that the defendant treated his corporations as extensions of himself. Instruction 12 was proper to aid the jury in sorting out this conflicting testimony.

Defendant also challenges instruction 13, the Subchapter S instruction, as not supported by the evidence. The jury heard a great deal of evidence about Subchapter S corporations. The defendant repeatedly made reference to the Subchapter S status of the LDH corporations. Instruction 13 substantially mirrors the testimony of Lawrence Redler, the defendant's accountant, regarding the tax effect of Subchapter S status. In addition, the instruction was a proper statement of the law. *See Fehlhaber v. Commissioner, I.R.S.*, 954 F.2d 653, 653–656 (11th Cir.1992). Reading instructions 12 and 13 in light of the entire set of jury instructions,[1] we hold that both instructions 12 and 13 fairly and accurately stated the law in the case and were supported by the evidence at trial.

Next, Hudson complains that the "deliberate ignorance" instruction, instruction 22, was error because it allowed the jury to convict the defendant on what he should have known and thus relieved the government of the burden of proving knowledge. He cites *United States v. Francisco-Lopez*, 939 F.2d 1405, 1409 (10th Cir.1991), where the court emphasized "that the deliberate ignorance instruction should be given only when evidence has been presented showing the defendant purposely contrived to avoid learning the truth."

■ "[T]he deliberate ignorance instruction must not be given unless evidence, direct or circumstantial, shows that defendant's claimed ignorance of an operant fact was deliberate." *Id.* at 1410. "The test is whether there was a conscious purpose to avoid enlightenment." *Griego v. United States*, 298 F.2d 845, 849 (10th Cir.1962). The deliberate ignorance instruction is, however, proper where evidence is presented to support both actual knowledge and

---

**1.** It is important to note that the jury was also instructed, at the defendant's request, that literal truth was a defense to the crimes charged.

deliberate ignorance. *See United States v. Ochoa–Fabian*, 935 F.2d 1139, 1142 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992); *United States v. Sasser*, 974 F.2d 1544, 1551–53 (10th Cir.1992), *petition for cert. filed,* —— U.S.L.W. —— (U.S. Dec. 4, 1992) (No. 92–6815); *Francisco–Lopez*, 939 F.2d at 1410. We note that the same set of facts may not be used to prove both actual knowledge and deliberate ignorance. *Francisco–Lopez*, 939 F.2d at 1410. We also note that the instruction is improper where the only evidence before the jury "points solely to direct knowledge." *United States v. Manriquez Arbizo*, 833 F.2d 244, 248–49 (10th Cir.1987).

■ The government presented evidence of direct knowledge.[2] Thus, the real issue here is whether there was also circumstantial evidence to warrant the giving of the instruction. The government presented circumstantial evidence that the defendant deliberately avoided acquiring truthful and complete information about certain material facts, such as the specifics about his liabilities and his assets. The defendant maintained throughout the trial that his answers at the debtor's examination were just guesses or estimates, that they were not intended to represent actual numbers and thus, they could not have been knowingly false.

However, Charles Getto, the attorney who conducted the debtor's examination on behalf of the FDIC, testified that the defendant did not ask to refer to any documents[3] or to qualify his answers by telling Getto that he would have to check certain documents to insure the accuracy of his answers. Georgia Splane, an office staff employee of LDH, Inc., testified that Hudson had full access to all LDH, Inc., financial records. John Rubow and Joseph Whisler, Hudson's attorneys at the time of the debtor's exam, also testified that Hudson was aware that the purpose of the exam was for the FDIC to determine his ability to pay the judgment against him. In light of this evidence, we hold that there was sufficient circumstantial evidence to warrant the deliberate ignorance instruction.

■ Even if the circumstantial evidence was insufficient to support the instruction, the error was harmless. The main problem with the instruction given in *Francisco–Lopez*, relied on so heavily by the defendant, was that it allowed the jury to convict the defendant based on negligence. *Id.* at 1411–12. By contrast, the deliberate ignorance instruction in the present case properly avoided references to "high probability" and the "average ordinary person" which create an objective standard by which to judge the defendant's knowledge. *See Sasser*, 974 F.2d at 1552–53. Instead, the instruction utilized phrases which employ a subjective standard, i.e., "that the defendant deliberately closed his eyes to what would otherwise have been obvious to him" and "willful blindness." *See id.* In addition, the jury was instructed that "a showing of mere negligence or mistake is not sufficient to support a finding of knowledge." *Id.* at 1552. Instruction 22 fully complied with the requirements set forth in *Sasser*.[4] The jury was not in-

2. In light of our ruling on Counts 2 and 3, we will consider Hudson's argument here only as it relates to Count 1.

3. Getto also testified that although he did not request specific documents be brought to the exam, the defendant was free to refer to any documents at any time.

4. Instruction 22 informed the jury as follows:
 With regard to the crimes charged in the Indictment, the element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him. A finding beyond a reasonable doubt of a conscious purpose to avoid enlightenment would permit an inference of knowledge. Stated another way, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of the fact.
 It is entirely up to you as to whether you find any deliberate closing of eyes, and the inference to be drawn from any such evidence. A showing of negligence or mistake is not sufficient to support a finding of willfulness or knowledge.
 If the government establishes beyond a reasonable doubt that the defendant acted with deliberate disregard for the truth, the knowledge requirement would be satisfied unless the defendant actually believed the statement made was true.

structed to consider what the defendant should have known, but rather what the defendant in fact either knew or avoided knowing. There was no risk that the jury convicted Hudson using a negligence or recklessness standard. *See id.* at 1553. Accordingly, the instruction does not warrant a new trial.

■ Next, the defendant attacks instruction 14 as contrary to the evidence. Instruction 14 informed the jury that the FDIC was not required to rely on Hudson's statements for him to be criminally responsible for them. Instruction 14 was an absolutely accurate statement of the law—reliance is not an element of a § 1001 violation. *See, e.g., United States v. Whitaker,* 848 F.2d 914, 916 (8th Cir.1988) (a statement need only be capable of influencing an agency's decisions to be material); *United States v. Kwiat,* 817 F.2d 440, 445 (7th Cir.) *cert. denied,* 484 U.S. 924, 108 S.Ct. 284, 98 L.Ed.2d 245 (1987).

■ Thus, it may well have been error to allow the defense to elicit the testimony about the FDIC's investigative efforts in the first place. Certainly, once that evidence was before the jury, instruction 14 was necessary to properly educate the jury that a statement is judged from the perspective of whether it was false when made, regardless of what the recipient knew or could have known. We hold that instruction 14 was mandated by the evidence brought out by the defendant.

■ Finally, the defendant challenges jury instructions 23, 8 and 15 because they are worded differently than the instructions submitted by the defendant. However, a defendant is not entitled to a new trial simply because the particular wording preferred by him was not employed. *See United States v. DeSoto,* 950 F.2d 626, 631 (10th Cir.1991); *United States v. Irwin,* 654 F.2d 671, 677 (10th Cir.1981), *cert. denied,* 455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982). Instruction 23 did not fail to inform the jury that the government had the burden of proving that the defendant caused a crime to take place. Instruction 23 cited section 2(b) as follows "[w]hoever willfully causes an act

to be done …" and included a reference to the legal standard "if you find beyond a reasonable doubt … that the defendant knowingly and willfully caused said acts to be done." This was sufficient, especially in light of the instructions as a whole, to apprise the jury of the burden of proof.

Similarly, defendant's challenge to instructions 8 and 15 is without merit. The court's phraseology explaining the elements that remained for jury determination was not prejudicial to the defendant.

*B. Exclusion of Defendant's Expert Testimony*

■ Hudson contends that it was error to refuse to admit the testimony of Roger Stanton on the question of whether the defendant had a legal duty to amend his debtor's exam responses and whether failure to do so amounted to a knowing concealment. Both parties agree that a witness may not testify as to an ultimate issue of law. *See Specht v. Jensen,* 853 F.2d 805, 808 (10th Cir.1988), *cert. denied,* 488 U.S. 1008, 109 S.Ct. 792, 102 L.Ed.2d 783 (1989). Federal Rule of Evidence 704 permits expert testimony on questions of ultimate fact. *See United Telecommunications Inc. v. American Television & Communications Corp.,* 536 F.2d 1310, 1318 n. 6 (10th Cir.1976). However, the defendant's question went well beyond eliciting testimony on a question of fact; it went to the ultimate conclusion—whether the defendant's failure to amend his answers amounted to a knowing concealment. The instant case is similar to *United States v. Brodie,* 858 F.2d 492, 495 (9th Cir.1988). In *Brodie,* the defendants attempted to illicit testimony from an accountant regarding the amount of taxes they owed. The court held; "[t]his ultimate conclusion was the very question the jury had to answer from the law and the evidence. It was not subject to a so-called expert's opinion." *Id.* Similarly, Hudson sought to introduce through Mr. Stanton an opinion on the ultimate conclusion; permitting a response would have been paramount to allowing an inquiry about whether the defendant was

guilty or not guilty and that would have clearly been improper.

### C. Defendant's Motions for Production by the Government

#### 1. The Secret Service Agent's Rough Notes

██ The defendant contends that the court's refusal to order production of the rough notes of Secret Service Agent Charles Quinn's interview with John Rubow was error justifying a new trial. Under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), the government is required to disclose all evidence of which it is aware that is favorable to the defendant and is material on the issue of guilt or punishment. This mandate includes evidence with impeachment value. *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985).

██ However, it is incumbent upon the defendant to establish materiality of requested but undisclosed material with possible impeachment value. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 59, 107 S.Ct. 989, 1002, 94 L.Ed.2d 40 (1987). Hudson fails to show that Agent Quinn's notes meet the requirements of materiality. Although the rough notes were used by the agent in preparing his final report, the uncontroverted evidence was that his final report included even more information and was more complete than were his rough notes.[5] Under the circumstances, the agent's notes were not required to be produced as *Brady* material.[6] *See United States v. Michaels*, 796 F.2d 1112, 1116 (9th Cir.1986), *cert. denied*, 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987).

Similarly, Agent Quinn's notes were not required to be produced as Jencks Act material under 18 U.S.C. § 3500 (1970). Hud-

son is correct that investigators' *reports* "clearly fall within the language of the Jencks Act." *United States v. Allen*, 798 F.2d 985, 997 (7th Cir.1986) (quoting *Goldberg v. United States*, 425 U.S. 94, 112–13, 96 S.Ct. 1338, 1349, 47 L.Ed.2d 603 (1976) (Stevens, J. concurring)).

██ However, investigating agent's rough notes are not automatically Jencks Act statements. *See Palermo v. United States*, 360 U.S. 343, 350, 79 S.Ct. 1217, 1223–24, 3 L.Ed.2d 1287 (1958); *United States v. Boshell*, 952 F.2d 1101, 1104–05 (9th Cir.1991); *United States v. Mena*, 863 F.2d 1522, 1529 (11th Cir.), *cert. denied*, 493 U.S. 834, 110 S.Ct. 109, 107 L.Ed.2d 72 (1989). Rough notes are not statements under section 3500(e) where they "are not complete, are truncated in nature, or have become an unsiftable mix of witness testimony, [and] investigators' selections, interpretations and interpolations." *United States v. Spencer*, 618 F.2d 605, 606–07 (9th Cir.1980). In addition, rough notes that are not intended as a final report are not "adopted or approved by the agent" as required by section 3500(e). *United States v. Kaiser*, 660 F.2d 724, 732 (9th Cir.1981), *cert. denied*, 455 U.S. 956, 102 S.Ct. 1467, 71 L.Ed.2d 674 (1982). We therefore conclude that where the substance of the defendant's statements are available to him via the agent's final report, the agent's rough notes from the interview are not required to be produced under either *Brady* or section 3500. *See Mena*, 863 F.2d at 1529.

#### 2. The Defendant's Prior Financial Statements

The defendant's argument regarding unidentified financial statements in the possession of the FDIC is puzzling. Hudson contends that he is entitled to a new trial

---

**5.** Before overruling the defendant's request, the court inquired of Agent Quinn as follows:

 Q: Agent Quinn, this report now was made with, or at least in part with the use of your rough notes; is that correct?

 A: Yes, Your Honor.

 Q: And you're saying under oath that this report accurately reflects anything that you have in your rough notes?

 A: Absolutely.

 Q: It goes beyond your rough notes?

 A: Yes, sir.

**6.** We note that the defendant filed a pretrial motion requesting that the government retain all rough notes and the government agreed to do so. *See United States v. Harris*, 543 F.2d 1247, 1249–52 (9th Cir.1976).

because the government failed to produce Hudson's prior financial statements which were allegedly a part of Charles Getto's file as *Brady* material. He asserts that these financial statements were referred to constantly by the government during both witness' testimony and closing argument as evidence that Hudson lied during the debtor's examination.

■ The court has reviewed the testimony of Gary Primavera, the FDIC attorney, surrounding the defendant's request for production of prior financial statements. We are satisfied that our refusal to require production of these documents does not require the granting of a new trial. Mr. Primavera's testimony was that Getto considered some "independent information" in the form of "older financial statements" when he recommended that the FDIC accept Hudson's settlement offer. The defendant then moved for production of these documents and we ordered the government to produce them if the government had them. The government responded that it did not have any such documents in their possession and we overruled defendant's motion.

We hold that the defendant is not entitled to a new trial on this ground. First and foremost, as already discussed in our evaluation of jury instruction 14, the government was not required to establish that the FDIC relied on Hudson's statements in order to prove their case. Accordingly, we fail to see how these alleged prior financial statements are relevant to any issue in this case or how they are required to be produced as *Brady* material.

Second, the defendant's request seeks unidentified financial statements. We cannot even be certain from Mr. Primavera's testimony whether Getto ever possessed any financial statements other than government's exhibit 107. Mr. Getto was not asked about these statements and the government stated that it had no knowledge of them. Thus, we have no way of ascertaining whether any such documents actually exist. Even if they do, we reiterate that we fail to see what value they would be to the defendant or how failure to produce

them will prejudice the defendant in any way.

### D. *Prosecutorial Misconduct*

■ The court is well aware of the restraints under which a prosecutor is expected to present a case to the jury. *United States v. Rios*, 611 F.2d 1335, 1342 (10th Cir.1979); *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). The court finds the statement by the government during closing argument that Rubow and Whisler testified that an attorney's statements are binding on his client were proper argument in this case. The statement certainly does not amount to prosecutorial misconduct warranting a second trial.

### E. *Dismissal of the Juror*

■ We hold that the defendant suffered no prejudice from the dismissal of juror Darrell Wallingford when he failed to appear for the second week of trial. The court may exercise its discretion to replace any juror "who, prior to the time the jury retires to consider its verdict, become[s] or [is] found to be unable or disqualified to perform [his] duties." Fed.R.Crim.P. 24(c); *see also United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir.1992), *reh'g denied; United States v. Fajardo*, 787 F.2d 1523, 1526 (11th Cir.1986). The only limitation is that the court have a sound and legitimate reason for doing so. *See United States v. Lewis*, 759 F.2d 1316, 1350 (8th Cir.), *cert. denied*, 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985); *United States v. Smith*, 918 F.2d 1501, 1511–12 (11th Cir. 1990), *cert. denied*, — U.S. —, 112 S.Ct. 253, 116 L.Ed.2d 207 (1991) (juror dismissed because she would be unable to be fair to either side due to her concerns over making her departure for a scheduled vacation); *United States v. Shelton*, 669 F.2d 446, 460 (7th Cir.), *cert. denied*, 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982) (discussing concerns over a potentially impatient and disgruntled juror on deliberations).

In the present case, juror Wallingford expressed concerns during voir dire about a trip on which he was scheduled to depart

the following week. When Wallingford did not appear for jury duty on the second Monday of trial, he was contacted by the court and claimed that he had been excused by the jury coordinator. Apparently, the coordinator had told the juror when he initially reported for jury duty that he could be excused for a trip he had already planned, but in the interim he should be prepared to serve. There definitely was a mix-up or misunderstanding and the juror was quite concerned that the case would not be completed in time for him to leave on his planned trip. The juror was dismissed because the court was of the opinion that to call him back under the circumstances would result in a disgruntled juror who would have real difficulty in being fair to one or both sides.

### III. Motion for Judgment of Acquittal

 The defendant seeks a judgment of acquittal under Federal Rule of Criminal Procedure 29(a), or in the alternative, a new trial because of insufficient evidence. "A verdict in a criminal case is sustained only when there is 'relevant evidence from which the jury could properly find or infer, beyond a reasonable doubt,' that the accused is guilty." *American Tobacco Co. v. United States,* 328 U.S. 781, 787 n. 4, 66 S.Ct. 1125, 1128 n. 4, 90 L.Ed. 1575 (1946) (citing *Mortensen v. United States,* 322 U.S. 369, 374, 64 S.Ct. 1037, 1040, 88 L.Ed. 1331 (1944)). "[T]he issue is whether, taken in the light most favorable to the government, there is substantial evidence from which a reasonable jury might properly find the defendant guilty beyond a reasonable doubt." *United States v. Johnson,* 911 F.2d 1394, 1399 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 761, 112 L.Ed.2d 781 (1991). The government is entitled to the benefit of all reasonable inferences consistent with the evidence at trial. *United States v. Dickey,* 736 F.2d 571, 583 (10th Cir.1984), *cert. denied,* 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985). "The court should enter a judgment of acquittal only if the evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United*

*States v. White,* 673 F.2d 299, 301 (10th Cir.1982).

### A. Count 1

Count 1 charged the defendant with making a false statement in violation of 18 U.S.C. § 1001. The essential elements of a section 1001 violation are: 1) that the defendant made the statement; 2) that the statement was false, fictitious or fraudulent; 3) that the defendant knew that the statement was false, fictitious or fraudulent; 4) that the statement was made knowingly and willfully; 5) that the statement was made within the jurisdiction of a federal agency; and 6) that the statement was material. *Irwin,* 654 F.2d at 675–76.

First, Hudson claims that the evidence was insufficient to support a conviction on Count 1 because his responses were literally true. Hudson declares that, as a matter of law, his responses may not form the basis of criminal prosecution because they do not meet the standards for falsity set out in *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973) (a perjury case). Hudson also relies on *United States v. Vesaas,* 586 F.2d 101, 103–04 (8th Cir.1978), where the court ruled that the defendant's statement that he did not own any stocks in joint tenancy with his deceased mother was not a false statement in violation of section 1001. The court reasoned that although the statement may have been misleading, it was literally true because it is legally impossible to own property in joint tenancy with a deceased person. *Id.*

 Hudson's argument is most persuasive with regard to the paragraph 11(b) statement wherein he was asked about any additional stock holdings and replied, "I can't think of any." Hudson contends that his answer, while nonresponsive, was not false. The government did not present any evidence to prove, beyond a reasonable doubt, that Hudson could have thought of the STL stock during the debtor's exam and thus enable the jury to infer that his answer was false. Even so, a new trial or a judgment of acquittal is not required

because the conviction on Count 1 is still supported by the jury's findings of guilt on the other three statements, paragraphs 11(a), (c), and (d).

Contrary to the defendant's arguments, we find these other three statements distinguishable from those in both *Bronston* and *Vesaas*. Unlike *Vesaas*, the answers were not false as a matter of law and they were not nonresponsive, yet literally true, answers to ambiguous questions as in *Bronston*. Rather, Hudson's responses were to direct, unambiguous questions, for example, "does anyone owe you any money?" Whether his answers were literally true was a question of fact for the jury and the jury, in a special verdict form, found that the defendant was guilty as to each of the charged material misrepresentations.

■ Hudson contends that there was insufficient evidence to sustain the jury's verdict on the first statement, paragraph 11(a), again because it was literally true that he was not owed money on the date of the debtor's exam for two reasons: 1) no agreement had been reached with TCI and thus all he had was a mere expectancy, and 2) the money, if owed at all, was owed to LDH, Inc., Hudson's corporation, and not Hudson personally. As we have already discussed, the government presented evidence that Hudson treated his corporations as extensions of himself. In addition, the jury was fully instructed, over objection by the government, on the defendant's literal truth defense. The trial spawned contradictory testimony regarding the defendant's belief about whether he was owed money on the date of the debtor's exam and whether he regarded his corporations as independent entities. Thus, it remained a task for the jury to determine whether Hudson's statements were false, i.e., whether Hudson believed he was owed money.

There was evidence supporting the conclusion that Hudson's answers were false. Testimony by Mr. Malone and Mr. Fisher, TCI executives, revealed a pattern and practice of TCI buying out Hudson's interest in completed cable systems. Fisher's memo of June 6, 1988, and Hudson's letter of June 13, 1988, indicated that the defendant expected to receive millions from the sale of his interest in the St. Louis cable television system. Moreover, financial statements submitted to Farm Credit Bank in Hudson's application for a loan, less than a year prior to the debtor's exam, support the inference that the defendant knew and believed that he owned a substantial interest in the St. Louis cable television system which was of considerable value. This inference is further supported by the testimony of Mr. Whisler, the defendant's attorney in 1988, that the defendant was prepared to sue TCI over the St. Louis cable system in the spring of 1988. The jury could reasonably conclude from this evidence that Hudson's unqualified statement that he was not owed any money was false.

■ Hudson also challenges the jury's verdict on paragraph 11(c) of the indictment wherein he gave mortgage amounts in excess of the actual amounts due. The defendant claims that these were not false because they were mere estimates, qualified by phrases such as "probably a little under," "I believe," "I think around," "it's less than," and "probably." Hudson ably made this argument to the jury and it was rejected. The verdict is supported by the evidence—the government offered documents showing the actual balances remaining on the mortgages. These documents reveal large discrepancies between the defendant's answers and the actual balances due.[7] Again, it was for the jury to weigh

---

7. The defendant suggests that Getto's questions were ambiguous as to whether Getto was asking for the original mortgage amounts or the current balances on the mortgages. Even so, the jury was free to infer that whether the defendant's answers were meant to indicate original mortgage amounts or current balances, the defendant's answers were false because even the original balances on the mortgages did not approach the figures given by Hudson at the debtor's exam. In addition, there was evidence that Hudson himself linked the word mortgage to debt when Getto asked him where certain farm rental income went and he responded, "To pay the mortgage, to pay the debt."

the evidence in arriving at their verdict.[8]

Suffice it to say that the arguments and resolution of Hudson's statement about the value of his home, paragraph 11(d), are sufficiently similar to all of those made above that we need not discuss them more fully here, especially in light of the special verdict form returned by the jury. In sum, we hold that the defendant is not entitled to a judgment of acquittal on Count 1.

### B. Count 2

Count 2 charged Hudson with a violation of 18 U.S.C. §§ 1001 and 2(b) for concealing or causing to be concealed, material information from a government agency. The government contends that Hudson failed to amend his debtor's exam testimony and purposefully caused his attorneys to initiate settlement negotiations and to request extensions of time to answer interrogatories and produce documents, all in order to knowingly conceal his true financial status from the FDIC for the purpose of inducing the FDIC to accept his settlement offer. The defendant challenges his conviction on Count 2 on the grounds of insufficient evidence.

■ Part of the government's theory rests on establishing that Hudson had a duty to amend pursuant to Federal Rule of Civil Procedure 26(e). Generally, a party is under no duty to supplement a response to a civil discovery request to include information acquired after the response is given except:

A party is under a duty to seasonably amend a prior response if the party obtains information upon the basis of which (A) the party knows that the response

was incorrect when made, or (B) the party knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

Fed.R.Civ.P. 26(e)(2). Thus, Hudson had a duty under rule 26(e)(2) to supplement his debtor's examination testimony if he received information which made his responses no longer correct and the circumstances were such that his failure to amend amounted in substance to a "knowing concealment."

■ We hold that, under the circumstances as shown by the evidence, Hudson is entitled to a judgment of acquittal on Count 2. As we expressed when ruling on the pretrial motions, we have serious doubts about whether Hudson may be held criminally liable for the breach of a duty created by a rule of civil procedure. However, even if we assume that Count 2 does state an offense, the evidence is insufficient to offer evidence to establish, beyond a reasonable doubt, that the defendant's failure to amend amounted to a knowing concealment.

The only evidence offered by the government was: 1) that the defendant did not want to pay the civil judgment; 2) that the defendant was aware that LDH, Inc., received $975,000 from TCI on July 1, 1988;[9] and 3) that the $975,000 was used to reduce some of the mortgages and to purchase CD's (all in the name of the defendant's corporations). At best, the government proved that some of the defendant's answers had changed and that the defendant knew it.[10] Even so, the government offered no evidence that under the circum-

---

**8.** As the government pointed out, the evidence was that defendant did not differentiate between himself and his corporations when referring to liabilities, such as the mortgages. Yet he claims to have so differentiated with regard to his statements about his assets. This evidence left the jury free to decide that if Hudson's statements about assets or receivables were literally true, then his statements about his liabilities could not also be true because those were corporate, and not personal, debts. One might conclude that we are faced with an inconsistent verdict because, under this reasoning, the jury could not have found that both 11(a) and 11(c)

were false. Even so, the error is harmless because, as we have already stated, a finding of guilt on any one of the four statements would support a conviction on Count 1.

**9.** This was 14 days after the debtor's exam and 10 days before Rubow contacted Getto regarding settlement.

**10.** We must assume that the defendant and his corporations were one and the same or that the defendant thought them to be to reach this conclusion.

stances the defendant knew that he had a duty to amend those answers, i.e., that Hudson failed to amend in order to knowingly conceal the information from the FDIC.

The uncontroverted evidence was: 1) that the defendant was advised by Myron Listrom, a well-known appellate attorney, that although his appeal from the civil case had merit, an appeal would be an expensive process and Hudson would be money ahead to settle the case for up to $175,000; 2) that Hudson, by authorizing Rubow to contact Getto about settlement, proceeded to follow Listrom's advice and settle the civil case for under $175,000; and 3) that both Hudson and the FDIC requested extensions of time to respond to motions pending in the case [11] because there was a strong possibility of settlement.

Even if Hudson knew that his representations would have been different on July 16, 1988, than they were on June 16, 1988, at the debtor's exam, it does not follow that he knowingly concealed the information from the FDIC, especially in light of the settlement negotiations.[12]

The government's further contention that even if Hudson did not have actual knowledge of his duty to amend, he "deliberately ignored" gaining such knowledge, is similarly unavailing. We repeat, no duty arises unless the circumstances were such that Hudson's failure to amend amounted to a knowing concealment. That the defendant did not want to pay the judgment and that he did not inquire of his attorneys about whether he had a duty to inform the FDIC about the $975,000 is not, under the circumstances, enough to give rise to the reasonable inference that the defendant took deliberate actions to avoid knowledge of a duty to amend.

The government also seeks to convict Hudson on Count 2 using 18 U.S.C. § 2(b), the aiding and abetting statute. The government's theory was that Hudson caused his attorneys to initiate settlement negotiations and request extensions for the purpose of concealing material information from the FDIC.[13] The indictment also charged that these actions were affirmative acts by Hudson to conceal and cover up his true financial position by trick, scheme or device.

The evidence at trial supported neither charge. As we have already discussed, the evidence was that prior to contacting Getto about settlement, Myron Listrom advised Hudson that he should try to settle the case. In addition, Whisler testified that the defendant did not even know that Whisler had requested the continuances.[14] The government's evidence that the defendant did not want to pay the judgment is insufficient to reasonably support the conclusion that Hudson's actions in settlement of the case were calculated to mislead the FDIC. Thus, defendant's motion for judgment of acquittal on Count 2 is granted.[15]

### C. Count 3

The defendant also attacks, on insufficient evidence grounds, his conviction on

---

**11.** Hudson requested extensions to answer interrogatories and produce documents. Getto requested an extension of time to respond to a motion to quash.

**12.** All of the attorneys who testified, including Charles Getto, were of the opinion that continuances to respond are standard practice where settlement negotiations are underway.

**13.** For clarity, we note that the evidence at trial was that settlement negotiations were initiated *pre*-trial and that Hudson authorized Rubow to initiate post-trial negotiations after the meeting with Myron Listrom.

**14.** The evidence does not support the government's statement in their brief that "He [Hud-

son] well understood that the initiating of settlement negotiations allowed him to avoid answering the post-trial discovery, which, according to the testimony of Agent Quinn, the defendant *had* discussed with John Rubow."

**15.** We need not reach the issue of whether this case is governed by *United States v. Tobon–Builes,* 706 F.2d 1092 (11th Cir.), *reh'g denied,* 716 F.2d 914 (11th Cir.1983) and *United States v. Cook,* 745 F.2d 1311 (10th Cir.1984), *cert. denied,* 469 U.S. 1220, 105 S.Ct. 1205, 84 L.Ed.2d 347 (1985) because we find that the defendant is entitled to a judgment of acquittal based on the insufficiency of the evidence. In addition, defendant's due process concerns and his arguments about the scope of § 1001 based on the definition of "transaction" are moot.

Count 3 for making false statements to the FDIC in violation of 18 U.S.C. §§ 1007 and 2(b) by causing his attorney, John Rubow, to falsely inform the FDIC that the defendant would take out a second mortgage on his home to pay the settlement. The government concedes that it offered no direct evidence that Hudson caused Rubow to make the statement. Thus, the question is whether there was sufficient circumstantial evidence to sustain the jury's verdict.

Charles Getto testified for the government that Rubow told him that the defendant would take out a second mortgage on his home in order to pay the settlement. Even viewing the evidence in the light most favorable to the government and assuming that Rubow made the statement, Hudson is not criminally liable for it unless he caused or directed Rubow to make it.[16] In addition to Getto's testimony, the government offered the following evidence: 1) Rubow's testimony that he had no knowledge of the defendant's financial condition independent of what the defendant told him; 2) Rubow's testimony that Hudson ordered Rubow to settle the case as cheaply as possible; 3) evidence that the defendant did not want to pay the judgment; and 4) testimony that the statement led Getto and Primavera to believe that Hudson was incapable of paying the entire judgment.

Of the above, only the evidence that Rubow had no independent knowledge of Hudson's finances is even relevant to our determination here.[17] Even if we assume that Rubow made the statement to Getto and that Rubow had no independent financial knowledge about Hudson's affairs, this evidence only tangentially supports the inference that Hudson told Rubow that he would take out a second mortgage to pay the settlement. Even so, finding Hudson guilty would require an addi-

tional inference—that Hudson also authorized or directed Rubow to make the statement to Getto. The government offered no evidence that Hudson authorized or encouraged Rubow to make the statement or that he somehow adopted Rubow's statement. Indeed, there was no evidence that Hudson even knew that Rubow had made the statement. Even looking at the evidence in the light most favorable to the government, the evidence was insufficient to support the jury's verdict on Count 3. Thus, the defendant's motion for a judgment of acquittal is granted on Count 3.

### D. The Judicial Function Exception

Defendant again raises the issue of the judicial function exception. The court has already addressed this issue fully in our prior opinion of August 21, 1992. Nothing new has emerged since that decision. Defendant's motion for judgment of acquittal on this ground is overruled and we refer the parties to our prior opinion.

IT IS THEREFORE ORDERED that defendant's motion to dismiss based on variance from the indictment (Doc. # 85) is denied.

IT IS FURTHER ORDERED that defendant's motion for a new trial (Doc. # 87) is denied.

IT IS FURTHER ORDERED that defendant's motion for judgment of acquittal (Doc. # 89) is denied in part and granted in part.

IT IS FURTHER ORDERED that government's motion to strike defendant's supplemental memorandum in support of post-trial motions (Doc. # 111) is denied.

---

**16.** Rubow testified that the scope of his authority to act for Hudson was limited to settling the case for under $175,000 and that Hudson did not authorize Rubow to make any representations about the source of the funds to pay the settlement. A client is not criminally bound by the attorney's statements if the statements are outside the scope of authority given by the client. *See United States v. Amelia,* 637 F.Supp. 1205, 1206–07 (D.Mass.1986).

**17.** The balance of the government's evidence— that Hudson did not want to pay the judgment or that he wanted to settle as cheaply as possible—is not substantial evidence to support an inference that Hudson caused Rubow to lie to the FDIC. In addition, evidence that Getto and Primavera relied upon this statement in settling the case is irrelevant as already discussed with regard to jury instruction 14.